## ERTEL, et al v. GENERAL MOTORS CORPORATION, et al.
### No. 72-4888.
Circuit Court, Duval County.

June 14, 1974.

Harold B. Wahl of Wahl & Gabel, Jacksonville, for the plaintiff, Harry F. Ertel.

William M. Howell, Jacksonville, for the plaintiff St. Paul Fire & Marine Insurance Co.

Robert C. Gobelman of Mathews, Osborne, Ehrlich, McNatt, Gobelman & Cobb, Jacksonville, for the defendant General Motors Corporation.

James F. Moseley of Toole, Taylor, Moseley & Milton, Jacksonville, for the defendants DeChaine Land Co. d/b/a Beach Marine, and Fidelity & Casualty Co. of New York.

Ellis E. Neder, Jacksonville, for the defendants Harrell Marine, Inc. and Wilson Harrell & Co., Inc.

J. Edwin Gay, Jacksonville, for the defendant Insurance Company of North America.

HENRY F. MARTIN, Jr., Circuit Judge.

*Statement of case and identification of parties:*

Plaintiff, Harry F. Ertel, hereinafter referred to as "Ertel," left his 38 foot Pacemaker sports fishing boat at Beach Marine marina for certain warranty repairs in January, 1971. This marina is located on the intracoastal waterway in the vicinity of Jacksonville Beach, Florida. Prior to the time the repairs were completed, the boat sank at the dock in the marina and plaintiff seeks to recover damages resulting from the sinking, and from certain repairs made following the sinking which he claims were negligently performed. Part of the repairs for which the boat initially entered the marina involved the marine gears on the two diesel engines aboard the vessel. These particular repairs were performed by defendant, General Motors Corporation, d/b/a Detroit Diesel Engine Division, hereinafter referred to as "GM." Defendant, Royal Globe Insurance Company, is GM's liability carrier in connection with plaintiff's present claim. Defendant, DeChaine Land Company, d/b/a Beach Marine, and its insurance carrier, Fidelity and Casualty Company of New York, together with defendant, Wilson Harrell and Company, Inc. and Harrell Marine, Inc., are involved in the ownership or operation of the marina and are all hereinafter referred to as the "marina" or "Beach Marine," unless it hereafter becomes necessary to differentiate between or among them. The factual situation with respect to the ownership and liability, if any, of the owners and operators of the marina is complicated somewhat by the fact that the marina was sold following the sinking and prior to the completion of the repairs on the boat in question. Plaintiff-intervenor, St. Paul Fire & Marine, hereinafter referred to as "St. Paul," has asserted a subrogation claim for sums previously paid on Ertel's behalf for damages to the hull and machinery of the boat due to the sinking and makes no claim with respect to the alleged negligent repairs following the sinking.

*Factual background*

The record in this case is voluminous and the court will not attempt to reiterate the vast amount of factual detail presented at the lengthy trial of this cause. The court will only set forth certain basic facts as found by the court for the purpose of presenting an overview of the entire case.

The boat in question carried the name of "C-Tertle III." Ertel purchased this boat new from the marina on April 3, 1970. The boat was used primarily by Ertel to entertain customers of his company, Asplundh Tree Expert Company, of which he was vice president and division manager. During the summer of 1970, the boat was in the vicinity of Southport, North Carolina, where it was

engaged in charter party fishing. In July or August of 1970, the marine reduction gear on the port engine burned up. This marine gear was replaced under warranty by an authorized GM dealer, East Carolina White Trucks. Thereafter, the boat operated in a normal manner until it left Southport for the Beach Marine in January, 1971, where it was scheduled to receive certain warranty repairs involving electrical work and adjustment of cabin windows and cabin door to prevent leaking. It was originally anticipated that the boat would proceed southward to the Bahamas for winter-time fishing following these warranty repairs. However, on the trip south to Beach Marine, the marine gear on the starboard engine burned up in what seemed to be an identical experience as previously encountered. The boat proceeded into the marina on the port engine alone.

Upon its arrival at the marina on January 17, 1971, the captain of the boat gave a list of desired repairs to marina personnel and stressed that necessary repairs to the marine gears was a priority item. Marina personnel called GM for warranty work on or replacement of the marine gears. Prior to the commencement of the various repairs, the captain of the boat turned the keys over to the marina and departed from the area.

Employees of GM arrived and determined that it would be necessary to disconnect the exhaust lines on both engines in order to remove the marine gears. After the exhaust lines were disconnected, the marine gears were transported into Jacksonville for repair or replacement. GM personnel requested exhaust line plugs from the marina and were advised that there were none available. The evidence establishes that such exhaust lines should be plugged or secured by tying-up the overhead or reconnecting to the engine to prevent water from entering such lines. The GM personnel determined that no plugs or other precautions would be necessary and departed from the boat, leaving the disconnected exhaust lines in substantially the same position as when they had been disconnected. Several days passed without incident and then the vessel sank during the early morning hours of January 28, 1971. The evidence is undisputed that water entered the vessel through the exhaust lines.

Prior to the sinking, marina personnel had been aboard the vessel in connection with the other warranty repairs consisting of electrical repairs and adjustment to cabin windows and cabin door referred to above. The marina personnel were not qualified to, nor did they undertake to perform, any work on the diesel engines which were located in the engine compartment under the deck of the vessel. The marina furnished the services of a night watch-

man who patrolled the marina at night and examined the various boats for any unusual or unseaworthy conditions.

### Legal relationship between parties

Upon delivery and acceptance of the boat in question, the marina became a bailee and was charged with the duty of exercising ordinary care for the protection of the boat. Stegeman v. Miami Beach Boat Slips, 213 Fed. 2d 561, 564 (5th Cir. Fla. 1954.) GM was an independent contractor who was called in by marina personnel for the convenience of the owner to perform specialized warranty service on the diesel engines of the vessel. There was no duty on the part of the marina to inspect the work being done by GM, nor to conduct any visual inspection of the engine compartment, including the exhaust lines unless and until there was some external evidence of the necessity for such inspection. Wentz v. Hartge, 132 Fed. Supp. 527, 532 (D.C.M.D. 1955). The marina did have the duty to, and actually did conduct exterior inspections of the vessel for the purpose of detecting any unusual or unseaworthy conditions. The night watchman at the marina conducted such inspection of the vessel in question in a reasonable manner at regular intervals during the nighttime immediately preceding the sinking and detected the vessel in the act of sinking, at which time he promptly requested assistance.

### Responsibility for sinking

The court has carefully considered the legal positions of the respective parties and the authorities submitted in support thereof. It is the conclusion of the court that the negligence of defendant GM in failing to plug or properly secure the exhaust lines was the sole legal cause of the sinking. The greater weight of the evidence fails to establish any negligence which was a legal cause of the sinking on the part of any other defendant. Accordingly, plaintiffs are entitled to recover against defendant GM and its insurance carrier for all legally recoverable damages arising because of the sinking.

### Damages by reason of sinking

Intervenor, St. Paul Fire & Marine, is entitled to recover on its subrogation claim in the amount of $41,261.33, together with interest thereon from and after the date of payment, which was November 8, 1971, in the sum of $6,395.53, making a total of $47,656.86.

Plaintiff Ertel is entitled to recover the following elements of damage:

1. Items of personalty aboard vessel at time of sinking, together with miscellaneous expenses incurred in connection with raising and repairing vessel in the sum of $4,200.50.

2. Fee of marine surveyor Strocchi for services connected with raising and repairing boat in the amount of $2,388.35.

3. Two insurance deductibles of $500 each in the sum $1,000.

4. Six months loss of charter hire, less expenses, in the sum of $695.50.

Total — $8,284.35

The court has concluded that there was no depreciation other than normal use applicable to said vessel immediately following the completion of the repairs. The court has further concluded that the other items of damage claimed by Ertel, including the claim for wages and expenses of the boat captain who was an employee of and paid by Asplundh Tree Expert Company, are not recoverable in this case.

### Damages subsequent to sinking

Plaintiff contends that repairs to the vessel, including engine repairs and improper cleaning of fuel tanks, caused additional damages for repairs, towing, loss of charter hire and depreciation. The evidence does establish that the engines developed a serious problem with overheating on or about February 29, 1972. The evidence further establishes that the repairs performed immediately following the sinking were performed pursuant to specifications and under the supervision of plaintiff's marine surveyor, and the vessel operated satisfactorily except for excess residue in the fuel until this new problem developed. The residue in the fuel was described as "Georgia mud" and required frequent fuel filter changes.

Plaintiff contends that the new problem with overheating of the engines was due to negligent repair of the engines by GM or failure of the marina to properly clean the fuel tanks of the vessel following the sinking. The evidence is insufficient to establish that the new problem which developed was due to any negligent repair of the engines. The evidence is also insufficient to establish that the problem was due to improper cleaning of the fuel tanks, since an expert diesel mechanic testified without contradiction that the "Georgia mud" in the fuel would not produce the problem discovered when the engines were torn down in the spring of 1972.

The greater weight of the evidence fails to establish that the subsequent problems were due to the negligence of any defendant in this case. Such problems were entirely consistent with any one

of several possible causes, including poor or improper care and maintenance of the vessel.

Accordingly, plaintiff Ertel is not entitled to recover any damages for problems arising subsequent to completion of repairs and acceptance of the vessel following the sinking.

Final judgment shall be entered in accordance herewith.

*Final judgment:* This cause came on for trial before the court without a jury, and the court having considered the evidence adduced by the respective parties, and in accordance with the memorandum opinion filed herein, it is adjudged as follows —

1. Plaintiff, Harry F. Ertel, do have and recover of and from the defendants, General Motors Corporation, a corporation, d/b/a Detroit Diesel Engine Division and Royal Globe Insurance Company, a corporation, in the sum of 8,284.35, for which let execution issue.

2. Plaintiff, Harry F. Ertel, is not entitled to recover from defendants, DeChaine Land Company, a corporation d/b/a Beach Marine, Fidelity and Casualty Company of New York, a corporation, Harrell Marine, Inc., a corporation, and Wilson Harrell and Company, Inc., a corporation, and said defendants shall go hence without day.

3. Plaintiff-intervenor, St. Paul Fire & Marine Insurance Company, a corporation, do have and recover of and from the defendants, General Motors Corporation, a corporation d/b/a Detroit Diesel Engine Division and Royal Globe Insurance Company, a corporation, in the sum of $41,261.33 as its damages, together with the further sum of $6,395.53 as interest thereon, making a total of $47,656.86, for which let execution issue.

4. Plaintiff-intervenor, St. Paul Fire & Marine Insurance Company, is not entitled to recover of and from the defendants, DeChaine Land Company, a corporation, d/b/a Beach Marine, Fidelity and Casualty Company of New York, a corporation, Harrell Marine, Inc., a corporation, and Wilson Harrell and Company, Inc., a corporation, and said defendants shall go hence without day.

5. Plaintiffs, Harry F. Ertel and St. Paul Fire & Marine Insurance Company, a corporation, are not entitled to recover of and from the defendant, Insurance Company of North America, a corporation, and said defendant shall go hence without day.

6. Costs and attorneys' fees shall be taxed, assessed or denied by the court in subsequent appropriate proceedings.